IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

LARRY J. BROWN,

                        Plaintiff,                  OPINION AND ORDER

  v.

                                                            20-cv-337-wmc

DOUG BELLILE, DANIEL KATTENBRAKER,
JOHN AND JANE DOE "SPECIAL NEEDS
COMMITTEE MEMBERS," LAURA THOMAS,
LISA POUILLIE, SARA DONOVAN,
JOSEPH SCHMELZLE, and DANIEL PARK,

                        Defendants.

*Pro se* plaintiff Larry J. Brown is proceeding under 42 U.S.C. § 1983 on claims that Sand Ridge Secure Treatment Center ("Sand Ridge") staff members acted with deliberate indifference to his medical needs in violation of the Fourteenth Amendment. Specifically, Brown alleges that Sand Ridge staff are ignoring his ongoing trouble swallowing and esophageal pain, which worsens when staff leave him too little time to eat his meals, and are refusing to provide blankets that do not irritate his skin condition. (Dkt. ##34, 35, 47.) For the following reasons, the court will deny without prejudice Brown's renewed request for counsel. (Dkt. #35.) However, in light of Brown's recent assertions that he had to be hospitalized on April 17, 2021, the court will hold a video hearing on his renewed motion for a preliminary injunction. (Dkt. #27).[1]

---

[1] Brown also seeks to compel defendants to respond to his discovery requests, apparently as a sanction for failing to respond within thirty days, and complains that defense counsel is trying to force Brown to pay postage due on a letter. (Dkt. #39.) Defense counsel promptly responded in a letter to Brown also filed with the court, indicating that the letter contained defendants' discovery responses and was timely mailed, but apparently had not been properly weighed and stamped before mailing. (Dkt. #40.) Defense counsel apologized to Brown and represents that another copy of the discovery responses was sent. (Dkt. #40.) Since the court has no reason to believe that the

**I. Renewed Motion for Preliminary Injunctive Relief**

Brown seeks a preliminary injunction that would require Sand Ridge to allow him to eat smaller, more frequent meals in his room and at his own pace, and provide a nighttime snack free-of-charge to ease his hunger at night, two extra pillows to elevate his head, and cotton blankets that will not irritate his skin condition. Defendants oppose such relief, and in response to the court's February 12, 2021, order, filed materials requested by the court that relate to Brown's current medical treatment. (Dkt. #32.) Brown responded, and has filled a letter with additional assertions about his current medical condition. (Dkt. ##34, 47.)

**A. Record of Treatment at Sand Ridge[2]**

Brown underwent a fundoplication in July 2017, a procedure to repair a hiatal hernia and to treat gastroesophageal reflux disease. (Dkt. #33-2 at 102.) Ever since, Brown has reported abdominal pain and dysphagia. In September 2018, he was seen at the University of Wisconsin Digestive Health Center for these concerns, and he underwent an upper endoscopy approximately a month later that "showed esophagitis and intact

---

incorrect postage was anything other than a mistake, and defense counsel has promptly corrected the error, plaintiff's motion to compel will be denied as moot. The court will also deny Brown's request to sanction counsel, as counsel has provided a reasonable explanation for the delay, and Brown has not shown any prejudice.

[2] The facts set forth here are largely derived from Brown's treatment records produced by the state, and from Brown's responses. (Dkt. ##33, 34, 47.)

nissen fundoplication."[3] (Dkt. #33-2 at 100.)

On July 23, 2019, Brown was admitted to Sand Ridge. A Sand Ridge doctor next submitted a consultation request on October 16, for Brown to see another provider at the UW Digestive Health Center in response to an "ongoing complaint of abdominal pain and dysphagia." (Dkt. #33-2 at 95.) Then, on November 12, 2019, Brown had a telemedicine visit with a nurse practitioner ("NP"), and told her that he was "still struggling" with abdominal pain and dysphagia, which he still believed were the result of his July 17 surgery. (Dkt. #33-2 at 100.) Brown also explained that his symptoms were worse when he was not able to eat in his room, because he needed extra time to finish his meals. Although Brown denied nausea or vomiting, he further reported that food would feel like it was getting stuck in his throat if he ate it too quickly.

The NP recommended that Brown either be allowed (1) more time to eat in the cafeteria *or* (2) to eat in his room. In addition, *if possible*, he seeks to be referred for a surgical consultation to explore whether his ongoing symptoms are in fact related to his fundoplication, and whether the procedure could be reversed. The NP also recommended that Brown:

1. Have peppermints with each meal to help relax the esophageal muscle and potentially relieve symptoms;
2. Elevate the head of his bed at night, with extra pillows if necessary;
3. Eat smaller, more frequent meals if possible;
4. Follow up as needed; and
5. Contact the office sooner if symptoms worsen or persist.

---

[3] A Nissen fundoplication is "a procedure to reinforce the lower esophageal sphincter" used to treat gastroesophageal reflux disease by "making it less likely that acid will back up in the esophagus." "GERD surgery," Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/gerd/multimedia/gerd-surgery/img-20006950 (accessed May 6, 2021).

(Dkt. #33-2 at 102-03.) Sand Ridge received this consultation note and recommendation from the telemedicine visit on December 18, 2019.

Regarding these recommendations, defendants note that Brown has never asked them to contact the Center for another visit.[4] Moreover, Brown was referred for a surgical consultation, which took place on March 10, 2020, although Brown counters that there was "no recommendation, examination, nor evaluation" done that day because his medical records were unavailable. (Dkt. #34 at 1.) Defendants also allowed Brown to have a wedge pillow, which Brown confirms that he places under his mattress, but also maintains he still needs additional, regular pillows to replace the "clothes, sheets, coats and sweaters" that he has been using to further elevate his head. (Dkt. #34 at 2.) Furthermore, while Brown can keep peppermints in his room, he complains about having to purchase them from the canteen because Sand Ridge follows "medication prescribing guidelines" that mirror those of "Medical Assistance in Wisconsin" and peppermints are "not a covered item."[5] (Dkt. #33 at 4.)

As for his meals, defendants assert that Brown *can* eat in his room and has been "encouraged to try eating smaller meals," although they stress that *actually* eating smaller meals "is a patient responsibility." (Dkt. #33 at 4.) Based on his unit progress notes from

---

[4] In his response, Brown contends that the statement "Patient advised to contact the officer sooner if symptoms worsen or persist" was invented by defendants as it does not appear in the record. (Dkt. #34 at 2.) However, the nurse practitioner *did* represent in her consultation note that she advised Brown to "return to clinic as needed" and "to contact the office sooner if symptoms worsen or persist." (Dkt. #33-1 at 103.)

[5] Brown's canteen food order receipts indicate that he ordered Starlite mints in November 2020. (Dkt. #33-3 at 3.)

4

November 30, 2020, through February 14, 2021, Brown accepts *and* eats his meals, often in his room, and he routinely socializes with other patients, watches television, works on the computer, and goes to work.[6] (Dkt. #33-2 at 11-68.) Although patients must dispose of some uneaten foods from their state-provided meal trays, they can keep other food items, such as fruit, to eat later. Moreover, they can supplement their diets with foods from the canteen. Further, Brown admits that he does not always follow a good diet (dkt. #34 at 2), and his canteen food orders placed between November 2020 and February 2021 included hot and spicy pork rinds, hot sauce, donuts, chili ramen, BBQ potato chips, refried beans, and popcorn with extra butter -- foods that his treatment physician asserts can contribute to gastroesophageal symptoms. (Dkt. ##33 at 8, 33-3 at 1-16.) According to Brown, however, he is "forced" to buy "canteen junk food" in order to have something to eat in his room whenever he wants to eat. (Dkt. #34 at 3.)[7]

Brown was next seen in the health services unit ("HSU") at Sand Ridge on January 15, 2020, for a follow-up visit with a physician's assistant ("PA") regarding his ongoing symptoms. The PA noted Brown's agitation at not yet receiving multiple pillows or several small meals per day. In response, the PA recounted that the request for additional pillows had "been addressed by special needs," and in the meantime, Brown had both a regular pillow and a wedge pillow that he could use to raise the head of his bed. The PA further informed Brown that Sand Ridge could not provide him with six small meals per day.

---

[6] The only documented meal time issue occurred on January 1, 2021, when Brown complained that he had not received enough meat on his meal tray. (Dkt. #33-2 at 35.) The issue was resolved when the kitchen brought him extra meat.

[7] Brown has not lost weight since his admission to Sand Ridge.

Instead, the PA advised him to "eat slowly, supplement w/canteen, & hold onto fruits." (Dkt. #33-2 at 9.) When Brown saw a doctor on January 24, 2020, and raised questions about this advice, the doctor "explained and agreed with" the PA's response, making the same recommendations as the PA. (Dkt. #33-2 at 9.)

Brown followed up with this same doctor on February 4, 2020, and repeated his requests for additional modifications. Specifically, Brown told the doctor that if he ate everything on his state-provided meal tray at once, then he would throw up. Brown also argued that Sand Ridge should provide him with peppermints, because they were medically recommended. Afterward, the doctor submitted Brown's requests for peppermints, additional pillows, six smaller state-provided meals as opposed to three larger meals, and to eat at his own pace, to the Institutional Special Needs Committee for consideration. However, these requests were apparently denied.

Of the 66 health service requests ("HSR") Brown submitted between January 2020 and February 2021, approximately ten concerned throat or stomach and digestive issues, at least in part. (Dkt. #33-2 at 125, 130-33, 142-44, 147, 163-64.) For example, Brown wrote to the HSU on January 30, 2020, asking why the nurse practitioner's recommendations had not been put in place yet, and was told that while outside providers may make recommendations, medical providers at Sand Ridge were responsible for making final decisions with respect to patient care. (Dkt. #33-2 at 163-64.) When Brown complained in April 2020 about having to wait six hours between antacid tab doses in particular, the prescribing physician explained that order. (Dkt. #33-2 at 147.) In May

6

2020, Brown also asked to restart omeprazole at a lower dose, which the doctor allowed.[8] (Dkt. #33-2 at 142-44.) Brown later complained in August 2020 that the kitchen used soy in taco and sloppy joe meat, which could be causing stomach pain, and was advised to avoid those two foods. (Dkt. #33-2 at 125.)

Most relevant here, Brown complained in an HSR on July 7, 2020, that he had been suffering stomach pains for two days, which antacid tabs had not relieved, and further suggested that staff would have examined him immediately but for his race. (Dkt. #33-2 at 133.) The nursing director responded that all patient requests had to be triaged, but because Brown's inference was concerning, she would forward his HSR to client rights. Brown responded with two additional HSRs on July 9, 2020, admonishing the nursing director for not ensuring that he was examined more quickly, a concern the nursing director noted as "reviewed." (Dkt. #33-2 at 131-32.) Still, when Brown asked on July 12, 2020, to see the doctor for his unresolved stomach pains, noting that he had been asking for a week to be seen, the treating physician merely responded that an appointment would be scheduled. (Dkt. #33-2 at 130.)

That appointment finally took place on July 24, 2020. Of the twelve times Brown actually saw the doctor between February 2020 and February 2021, however, the medical progress notes do not document any complaint of gastrointestinal concerns other than at this July visit. (*See* dkt. #33-2 at 69-79.) At that time, Brown did again share his belief

---

[8] Omeprazole "is used to treat certain conditions where there is too much acid in the stomach," including esophagitis and gastroesophageal reflux disease. "Omeprazole (Oral Route)," Mayo Clinic, https://www.mayoclinic.org/drugs-supplements/omeprazole-oral-route/description/drg-20066836 (accessed May 6, 2021).

that staff did not immediately evaluate him for stomach pain earlier that month because of his race. (Dkt. #33-2 at 72.) In response, the doctor explained Sand Ridge's triage system to determine a patient's need for further evaluation, as well as indicated that the process has been properly followed in Brown's case. The doctor also addressed Brown's complaint of "gas pressure," noting that this symptom had responded to simethicone, which is used to relieve gas pains, and "available immediately in his room." (Dkt. #33-2 at 72.)

On May 3, 2021, Brown filed a letter asserting that he was *hospitalized* on April 17, 2021, for the "very same medical condition" underlying this lawsuit, that the doctors who treated him recommended that he eat 4-5 small meals a day, and defendants continue to ignore this recommendation. (Dkt. #47 at 1.) Although Brown's letter does not provide details regarding his hospitalization, he references two medical information reports from the Mile-Bluff Hospital and asserts that he is suffering a "medical emergency." (Dkt. #47 at 2.) Brown further asserts that on April 22, 2021, defendants wrote him up on a conduct report as punishment for his "medical condition," and for his inability to eat meals within the set meal time. (Dkt. #47 at 1.)

### B. Analysis

"A preliminary injunction is an extraordinary equitable remedy that is available only when the movant shows clear need." *Turnell v. CentiMark Corp.*, 796 F.3d 656, 661 (7th Cir. 2015) (internal citation omitted). Under the Seventh Circuit approach, a district court engages in a two-step analysis where "[i]n the first phase, the party seeking a preliminary injunction must make a threshold showing that: (1) absent preliminary

injunctive relief, he will suffer irreparable harm in the interim prior to a final resolution; (2) there is no adequate remedy at law; and (3) he has a reasonable likelihood of success on the merits." *Id*. at 661-62. If the movant makes these showings, then the court considers: "(4) the irreparable harm the moving party will endure if the preliminary injunction is wrongfully denied versus the irreparable harm to the nonmoving party if it is wrongfully granted; and (5) the effects, if any, that the grant or denial of the preliminary injunction would have on nonparties." *Id*. at 662. Finally, "[t]he court weighs the balance of potential harms on a 'sliding scale' against the movant's likelihood of success: the more likely he is to win, the less the balance of harms must weigh in his favor; the less likely he is to win, the more it must weigh in his favor." *Id*.

Here, Brown seeks a preliminary injunction that would require Sand Ridge to provide him 6 small meals a day that he can eat in his room at his own pace, as well as a nighttime snack, and extra pillows to raise his head at night, all to help avoid making his gastroesophageal pain worse and to stave off nighttime hunger. In its original February 12, 2021, order, the court denied preliminary relief based on Brown's original assertion that Sand Ridge could not charge him for items such as snacks, pillows, and blankets that might relieve certain medical symptoms, finding that Brown incurring some debt to receive these items during the pending lawsuit, whether forgiven should he prevail or be repaid in installments should he lose, did not constitute irreparable harm. (Dkt. #29 at 3.) However, the court also explained that Brown's new assertions of suffering serious pain on a daily basis as a result of his gastroesophageal symptoms, allegedly made worse by defendants' refusal to allow him to eat his meals in his room at his own pace, *might* change

9

the balance of interests, at least as to irreparable harm. (Dkt. #29 at 4.) Accordingly, the court required more information be provided by defendants with respect to this issue. (Dkt. #29 at 4-5.)

In response, defendants maintain that a balancing of harms still cannot be struck in Brown's favor on this record. As for his demand for an additional pillow, Brown admits having a wedge pillow he can insert under his mattress to raise the head of his bed, and he does not explain how an extra regular pillow would make a material, medical difference. As for state-provided meals, while defendants acknowledge that Brown is not provided extra time to eat, nor provided more frequent, smaller meals, they maintain that this simply places some responsibility on Brown to help manage his condition by planning what to eat and when. In particular, defendants stress that Brown has been allowed to eat in his room, and was doing so without issue or concern, at least through February 2021 as his unit progress notes document. Moreover, the record shows Brown has been advised that he *may* keep some of the state-provided food, such as fruit, from his meal trays to eat later. Again, Brown does not explain why the standard mealtimes do not allow him sufficient time to digest a sufficient portion of the state-provided food, leaving for after mealtime the food items he can save and digest later. Moreover, Brown is able to buy food from the canteen, including mints, to eat whenever he wants. While Brown responds that he is "forced" to buy "junk food" from the canteen and, therefore, cannot maintain the most healthful diet for his condition (dkt. #34 at 2-3), he has not established that the canteen does not also offer healthier choices that could help soothe his gastroesophageal symptoms. Given that his condition can be made worse by what Brown eats, he bears some

responsibility when making such choices, to the extent he can. Of course, the court is not suggesting that Brown's dietary habits would justify inadequately treating a serious medical need, which is addressed below.

Moreover, as the court has noted, Brown has income, albeit limited, to purchase additional needs such as pillows, peppermints, and food. Brown may be unwilling to take out a loan to make these purchases, but he does not allege that defendants have *denied* him access to the canteen, to a loan, or even to an allowance, should he qualify for the latter. At bottom, absent the accommodations he requests, the record does not show a decline in Brown's weight or his health while at Sand Ridge through February 2021.

Nor do Brown's myriad HSRs and the progress notes from his doctor visits reflect unaddressed complaints of ongoing, worsening stomach or throat pain.[9] Instead, Sand Ridge staff arranged the Digestive Center consult in response to his initial complaint of pain and dysphagia after arriving at the facility, and both a PA and a doctor promptly followed up with him regarding the nurse practitioner's recommendations. Sand Ridge staff have since responded promptly to Brown's related concerns in his HSRs regarding those recommendations, his gastrointestinal medications, and the kitchen's use of soy in certain meats. Although Brown is obviously dissatisfied with how his July 2020 complaint of stomach pain was triaged, the record shows that 80 mg simethicone chew tablets were

---

[9] Brown counters in his reply that he did not persist in complaining about his gastroesophageal pain because defendants "were not that interested in helping him" so "it would do no good to keep asking." (Dkt. #34 at 2.) However, a defendant cannot act "with purposeful, knowing, or reckless disregard of the consequences" of a treatment decision or a response to a request for care without first being aware of the serious medical need -- here, allegedly serious, ongoing pain. *See Hardeman v. Curran*, 933 F.3d 816, 826 (7th Cir. 2019) (Sykes, J., concurring) (explaining that the "objective unreasonableness" standard had been extended to pretrial detainee deliberate indifference claims).

immediately available to Brown in his room as of July 7, and that he had also by then restarted taking 20 mg of omeprazole daily, presumably to help manage his digestive pain and flareups. (Dkt. #33-2 at 86, 90.) Finally, Brown was seen by his doctor in July in response to a request for an appointment, who also addressed Brown's gas pain. While Brown might disagree with the approach taken by Sand Ridge's medical staff, that is *not* proof of deliberate indifference. *See Ciarpaglini v. Saini*, 352 F.3d 328, 331 (7th Cir. 2003) (a plaintiff's dissatisfaction or disagreement with medical professionals about his needs does not state a claim of deliberate indifference.)

That said, the record remains unclear with respect to the urgency of one aspect of his ongoing care, having to do with the upshot of Brown's surgical consultation and assertion of a recent hospitalization. Although a consultation concerning the possible reversal of his fundoplication took place in March 2020, Brown asserts that little came of that visit because his medical records were not available. (Dkt. #34.) There is no indication that the consultation was ever rescheduled. Brown further alleges that he had to be hospitalized on April 17, 2021, as a result of his medical condition, and that defendants have not responded appropriately. (Dkt. #47.) Without Brown's medical records concerning this latest event, the court cannot determine how to weigh it, and his related assertions suggest that his ongoing gastroesophageal condition may now be worsening either as a result of defendants' alleged failure to accommodate his condition or refusal to consider reversal of his fundoplication.

Accordingly, the court will hold a video hearing on Brown's pending motion for preliminary injunctive relief. The parties should be prepared to address both: (1) the

status of Brown's surgical consultation; and (2) whether his current medical treatment and accommodations for his gastroesophageal condition remain adequate in light of his claimed hospitalization on April 17, 2021. In advance of that hearing, defendants are also directed to provide any additional medical records in their possession regarding Brown's treatment for his ongoing gastroesophageal pain since their February 26, 2021, response, including any available medical records related to Brown's recent hospitalization.[10] Moreover, Brown's principal treating physician should be available at the hearing.

**II. Renewed Motion for Assistance in Recruiting Counsel**

Brown has also renewed his motion for assistance in recruiting counsel, stating that: (1) this case involves complex medical issues; (2) he suffers from mental health disorders that make it difficult for him to concentrate or comprehend simple vocabulary and cause him to feel stressed more easily than others; (3) he will need to depose certain yet-unidentified defendants; (4) defense counsel is misrepresenting the facts and defendants' version of the facts conflict with his; and (5) he does not know what he is doing and every case he has filed in this court has been dismissed or lost. (Dkt. ##35, 36 at 2-4.) For the following reasons, the court will again deny this renewed motion at this time.

As Brown is by now well aware, a *pro se* litigant does not have a right to counsel in a civil case, *Olson v. Morgan*, 750 F.3d 708, 711 (7th Cir. 2014), but a district court has discretion to assist *pro se* litigants in finding a lawyer to represent them. *Pruitt v. Mote*, 503 F.3d 647, 649 (7th Cir. 2007). A party who wants such assistance must meet certain

---

[10] To the extent necessary, Brown is directed promptly to sign any further medical waivers required for defendants to obtain those records.

requirements. *Santiago v. Walls*, 599 F.3d 749, 760-61 (7th Cir. 2010). As an initial matter, he must show that he is unable to afford counsel and that he made reasonable efforts on his own to find a lawyer to represent him. while Brown has satisfied these requirements (dkt. #37), Brown has still not shown at this early stage that this is one of the relatively few cases in which the legal and factual difficulties exceed his demonstrated ability to prosecute it. *Pruitt*, 503 F.3d at 654-55. Again, as Brown well knows, the "question is not whether a lawyer would present the case more effectively than the *pro se* plaintiff" but instead whether the *pro se* litigant can "coherently present [his case] to the judge or jury himself." *Id.* at 655. Ideally, every deserving litigant would be represented by a lawyer, but the unfortunate reality is that the *pro se* plaintiffs who file lawsuits in this federal court vastly outnumber the lawyers who are willing, able, and qualified to provide representation. Even when the court decides to help a *pro se* litigant find a volunteer attorney, those lawsuits are delayed significantly, since even a simple case is stayed for months while the court recruits counsel. Accordingly, the court must decide for each case "whether this particular [plaintiff], among many deserving and not-so-deserving others, should be the beneficiary of the limited resources of lawyers willing to respond to courts' requests." *McCaa v. Hamilton*, 893 F.3d 1027, 1036 (7th Cir. 2018) (Hamilton, J., concurring).

The court cannot conclude at this still early stage of the case that Brown is unable to litigate this case, or that it will boil down to issues too complex from him to handle. Only screening has been completed and discovery is underway, meaning Brown's near-term obligations include (1) preparing and responding to discovery requests, and, if necessary,

(2) filing an amended complaint.  Although Brown suffers from several mental health disorders, he does not explain how those disorders are interfering with his ability to complete any of these specific tasks at hand.  While he indicates that he may need to depose certain defendants, Brown can try discovery methods other than depositions to ask defendants for the information he thinks is needed.  Indeed, the court issued a preliminary pretrial conference order that contains guidance on how to gather information to prove his claims by conducting discovery.  (Dkt. #30.)

Certainly, Brown's relevant medical treatment spans several years, but it is Brown who has personal knowledge of his medical condition and treatment, and so far, his filings have been readable, articulate, and reflect an understanding of the relevant legal standards and factual bases of his claims.  He has also demonstrated an ability to gather, sort and present evidence in selecting exhibits in support of his complaint and his requests for injunctive relief and for counsel.  (Dkt. ##1, 3, 39.)  Through his filings, including an interlocutory appeal, Brown has shown that he is very much capable of the tasks at hand and can effectively advocate for himself.  That he may have been unsuccessful in pursuing other cases before this court does not mean that he automatically requires counsel in this case, or even that he was unable to coherently present his case in those prior lawsuits.  If anything, his litigiousness places an extra burden on the court to exercise discernment as to the appropriate case *and* time to consider recruitment of counsel.

To the extent Brown is concerned about conflicting versions of events, or about defense counsel allegedly misrepresenting facts, he should focus his energy on the tasks immediately before him:  preparing for the preliminary injunction hearing on the narrow,

remaining issues related to his surgical consult and recent hospitalization; and gathering the information he will need to prove his claims. Although Brown maintains that he cannot investigate the facts because he is "confined to [his] unit," his medical records and personal knowledge of the relevant alleged events can guide his discovery requests. (Dkt. #36 at 3.) In any event, factual disputes commonly occur in the context of litigation. As this case progresses, the parties will have an opportunity to present their respective versions of events and evidence in support. Until then, the court cannot determine whether any of Brown's claims will require a trial due to material factual disputes.

That said, the court remains concerned about Brown's mental health issues. Given the number of current defendants and claims, it might become clearer that the court's guidance is insufficient and that assistance in the recruitment of counsel is appropriate. Accordingly, the court will again deny Brown's request *without* prejudice to his renewing it at a later date should his circumstances change, or specific litigation tasks become too difficult. For now, Brown should carefully review this court's preliminary pretrial conference order (dkt. #30) and rulings to date, in order to do his best to follow the court's guidance.

ORDER

IT IS ORDERED that:

1) The court will hold a video hearing on plaintiff Larry Brown's renewed motion for a preliminary injunction (dkt. #27) on May 24, 2021 at 1:00 p.m. Counsel for defendants will be responsible for setting up the videoconference with the clerk's office and insuring the participation of both plaintiff and his treating physician.

2) In advance of the hearing, (a) defendants shall also produce any additional medical records of plaintiff's treatment for his ongoing gastroesophageal pain since their February 26, 2021, response, including any available medical records related to plaintiff's recent hospitalization; and (b) plaintiff shall promptly cooperate in providing any waivers necessary for defense counsel to obtain those additional records.

3) Plaintiff's renewed motion for assistance in recruiting counsel (dkt. #35) is DENIED without prejudice.

4) Plaintiff's motion to compel discovery and for sanctions (dkt. #39) is DENIED.

Entered this 6th day of May, 2021.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge