IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

LARRY J. BROWN,

                    Plaintiff,                          OPINION AND ORDER

        v.                                              20-cv-337-wmc

DOUG BELLILE,
DANIEL KATTENBRAKER,
LAURA THOMAS, LISA POUILLIE,
SARAH DONOVAN,
JOSEPH SCHMELZLE, and
DANIEL PARK,

                    Defendants.

On December 3, 2020, *pro se* plaintiff Larry J. Brown was granted leave to proceed under 42 U.S.C. § 1983 against several Sand Ridge Secure Treatment Center staff members on claims that they refused to consider or accommodate his chronic dermatological and gastroesophageal issues. In late October of 2021, defendants filed a motion for summary judgment, along with all necessary, supporting materials. (Dkts. ##66-72.) After much cajoling, denials of multiple requests for counsel, and repeated extensions of time, plaintiff finally responded to that motion on May 23, 2022, including a counter set of proposed findings of facts, a supporting declaration, and exhibits. (Dkt. ##81-82.) He has now also filed a sur-reply with additional exhibits.[1] (Dkt. #85.) The parties then filed

---

[1] Brown did not have leave to file a sur-reply, but the court has considered it in light of his *pro se* status, especially since nothing in the sur-reply changes the outcome. Primary among his additional arguments is Brown's challenge to the court's earlier decisions denying his requests for assistance with recruiting counsel based on limited law library access at Sand Ridge. Rather than grant those requests, the court *repeatedly* extended Brown's summary judgment response deadline, and ultimately reduced his obligation at summary judgment just to respond to defendants' proposed findings of fact in hopes of easing any remaining concern he may have to being allowed limited law library access. (Dkt. ##76, 78, 80.) The court will not revisit this issue.

supplemental briefing after the court held a videoconference on June 17, 2022, with the parties on the summary judgment motions.  (Dkt. ##88-91.)[2]  For the reasons set forth below, the court will now deny plaintiff Brown's motion, and grant defendants' motion.

UNDISPUTED FACTS[3]

**A. Background**

Since July 23, 2019, Brown has been civilly committed to Sand Ridge for treatment under Wisconsin Statutes Chapter 980.  Sand Ridge provides specialized mental health treatment, rehabilitation, training, and supervision to Chapter 980 patients who, like Brown, have been convicted of "a sexually violent offense" and completed the incarceration portion of their sentences within a Department of Corrections ("DOC") facility, but are still deemed unsafe for release back into the community because "the person's mental disorder makes it likely that he or she will engage in acts of sexual violence."  Wis. Stat. § 980.02(2)(a)-(c).

---

[2] Brown subsequently filed a motion for a transcript of that proceeding, as well as for copies of certain notes, which is addressed in the last section of this opinion.  (Dkt. #92.)

[3] The court has drawn these facts from the parties' proposed findings of fact and responses, as well as the underlying evidence, including Brown's medical records (dkt. ##33-2, 55-1, 69-1), all being viewed in the light most favorable to Brown as the non-moving party.  Defendants submitted proposed findings of fact explaining their version of the underlying events.  (Dkt. #68.)  Ultimately, Brown did not follow the court's procedures by submitting numbered responses to each of defendants' proposed findings of fact, but he did finally submit a declaration and some of his own proposed findings of fact, as well as supplemental briefing, all of which provide his side of the story. After considering those submissions, however, the defendants' proposed findings of fact are largely undisputed because Brown chose not to respond at all, even if only by submitting admissible evidence in dispute or clarifying factual disputes and gaps in the record during the videoconference on the pending motions for summary judgment.  Thus, unless otherwise noted, the following facts are material *and* undisputed on this record.

Defendants have all worked at Sand Ridge during at least part of Brown's civil confinement, including Psychiatric Care Supervisors Daniel Park and Sara Donovan, Psychiatric Care Technician Joseph Schmelzle, Institution Unit Supervisor Lisa Pouillie, Director Doug Bellile, Physician Manager Daniel Kattenbraker, M.D., and Director of Nursing Laura Thomas.  Dr. Kattenbraker and Nurse Thomas also comprise the only members of Sand Ridge's "Special Needs Committee," which was created to prevent conflict between patients and primary care providers at Sand Ridge over "special" medical needs requests.

While still completing his criminal sentence at the DOC's Columbia Correctional Institution ("CCI"), Brown was diagnosed with dermatitis.  (Dkt. ##1-3 at 4, 69-1 at 261.) To relieve his associated itching and irritation, a doctor at CCI ordered Brown two cotton blankets.   (Dkt. #1-12.)   Brown was also diagnosed with progressive macular hypomelanosis, which causes light-colored spots on the skin.  (Dkt. #1-3 at 1-2, 33-2 at 74.)  For that condition, dermatological specialists recommended benzoyl peroxide body wash and clindamycin gel or lotion, as well as UVB phototherapy treatment.  (Dkt. #1-3 at 2.)  Brown was also prescribed hydroquinone cream.  (Dkt. ##33-2 at 75, 55-1 at 10.)

In 2017, Brown further underwent fundoplication surgery at the University of Wisconsin Hospital in Madison, Wisconsin ("UW"), to address a hiatal hernia and gastroesophageal reflux disease.  (Dkt. #33-2 at 102, 181.)  His UW doctors also recommended that he:  (1) raise the head of his bed so it is 6 to 8 inches higher than the foot of his bed; and (2) eat 4 to 5 small meals a day, rather than 3 big meals.  While at CCI, Brown received two, extra pillows and a wedge to elevate his head, a nighttime snack,

and meals in his cell.  (Dkt. #1-12.)  Then, on July 1, 2019, Brown had an esophageal pH test at UW, which produced normal results.  (Dkt. #33-2 at 1.)  Even so, Brown has reported continued difficulty swallowing, esophageal pain and having to eat more slowly.

## B. Requests for Medical Care at Sand Ridge

After moving to Sand Ridge in 2019, Brown began requesting similar accommodations and items as provided to him without cost at CCI.  Patient care management at Sand Ridge developed a slightly different approach based on its own providers' assessments, determinations of medical necessity, and that facility's policy and protocols, including requiring Brown to cover some of the costs of healthcare.  In response, Brown sent two health services requests ("HSR") to Sand Ridge's health services unit ("HSU") on August 12, 2019.  In one HSR, Brown explained that even with both a wedge and a standard pillow provided at Sand Ridge, he still needed an extra, standard pillow, citing past doctors' orders and his fundoplication surgery.  In reply, Brown was told that the Sand Ridge HSU does not dispense pillows.  In addition, Brown requested a nightly snack because he would get hungry due in part to his gastrointestinal problems, but that request was also denied.[4]

Two days later, Sand Ridge's Director of Nursing Thomas and Physician Manager Kattenbraker, in their capacity as the sole members of the Special Needs Committee, denied Brown's similar requests in writing.  (Dkt. ##56-2 at 1, 82-2 at 2.)  The

---

[4] In supplemental briefing, Brown further notes that he needs a snack at night because he suffers from diabetes, thereby attempting to revive a claim against a defendant that the court dismissed at screening.  (Dkt. ##88 at 2, 89 at 1.)  The court will not permit Brown to do so at this late stage of the lawsuit.

Committee's letter response rather summarily explained that Sand Ridge simply does not provide snacks nor extra pillows above the allowable limit of two. The letter further suggested that Brown retain fruit from his meal trays to eat later, as well as consider purchasing additional food from the canteen. In his declaration in support of summary judgment, defendant Kattenbraker further attests that because Sand Ridge's kitchen does not operate 24 hours a day, a bedtime snack service is not practical. Finally, Dr. Kattenbraker asserts that a third pillow is not medically necessary because Brown already has a wedge pillow to insert under his mattress and raise his head.

Still, Brown asserts that without a third pillow, he cannot raise the head of his bed to the recommended 6-8 inches, and he continued to request similar items and accommodations in follow-up HSRs. Brown also asked that in lieu of 3 regular meals, he instead be provided 4-5 small meals throughout the day. Nursing Director Thomas responded to these additional HSRs which Brown submitted on August 14, August 15, and October 13, respectively, either by advising Brown to refer to the Special Needs Committee's original, August 2019 decision *or* refer his concerns to the "client rights department." (Dkt. ##33-2 at 180, 177, 69-1 at 314). Dr. Kattenbraker similarly referred Brown back to the "prior response" upon receipt of his additional, September 25 HSR, which again asked for a pillow, snack and "5 small meals." (Dkt. #33-2 at 178.) Brown also asked for cotton blankets around this time, which the Committee similarly declined to provide, stating in an October 25, 2019, letter that there was no such recommendation in his medical chart and inviting him to provide any additional information supporting that request. (Dkt. ##1-11, 56-2 at 3.) Brown did so by submitting a "special handling"

summary from CCI, stating that he had been allowed cotton blankets in his cell.  The Committee then rejected Brown's request once more in a November 4, 2019, letter because the CCI summary provided "no identified medical need" for cotton blankets.  (Dkt. #56-2 at 4.)

Even so, a treating doctor at Sand Ridge submitted a consultation request on October 16, 2019, to allow Brown to see another provider at the UW Digestive Health Center in response to his "ongoing complaint of abdominal pain and dysphagia."  (Dkt. #33-2 at 95.)  On November 12, 2019, Brown had a telemedicine visit with a nurse practitioner at the UW Digestive Health Center regarding post-surgery gastroesophageal issues and abdominal pain.  During that call, Brown told the nurse practitioner that:  (1) Sand Ridge staff were refusing to adopt the accommodations previously approved by CCI's medical staff; and (2) he was "still struggling" with abdominal pain and dysphagia, which he believed were the result of his 2017 surgery.  (Dkt. #33-2 at 100.)  At the conclusion of that visit, the nurse practitioner recommended that Brown:  (1) be referred for a surgical consult;  (2) be allowed more time to eat or to eat in his room, if possible;  (3) eat peppermints with each meal to relax his esophageal muscle;  (4) elevate the head of his bed at night; and (5) try to eat smaller, more frequent meals, if possible.  (*Id.* at 102.)  On January 15, 2020, Brown asked a Sand Ridge physician assistant about the recommendations, who advised that Sand Ridge could not provide several smaller meals a day so Brown should "eat slowly, supplement w/canteen, & hold onto fruits."  (*Id.* at 9.)  Brown raised the same concerns during a visit with his Sand Ridge treating physician on January 24, and the doctor agreed with the physician assistant's advice.  (*Id.*)

6

Next, Brown sent an HSR on January 30, 2020, asking why he was not receiving these recommended accommodations at Sand Ridge, to which Nursing Director Thomas responded the following day.  Specifically, Thomas explained that while outside providers may make *recommendations*, Sand Ridge medical staff make the final decisions.  (*Id.* at 163-64.)  Even after a Sand Ridge health care provider submitted a request on Brown's behalf on February 4, 2020, for an additional pillow, peppermints, more frequent, smaller meals and to be able to eat at his own pace (*id.* at 10), the Special Needs Committee referred Brown to "previous information provided about similar requests."  (Dkt. ##3-2 at 1, 56-2 at 12.)

### C. Ongoing Medical Care at Sand Ridge

Still, Brown has continued to receive follow-up care regarding his gastroesophageal symptoms.  He underwent a swallow study and esophagram on April 16, 2021, with normal results.  The speech pathologist concluded that Brown was experiencing anxiety before swallowing "as there is no apparent structural cause" for his swallowing difficulty.  (Dkt. #55-1 at 29.)   The pathologist recommended that Brown continue with a regular consistency diet, as well as consume frequent, small meals (or snacks), and also take his reflux medication as prescribed, add extra moisture to dry or dense foods, and alternate solids and liquids when he ate.  In addition, after a meeting with another UW Hospital nurse practitioner on July 22, 2021, Brown agreed to proceed with a "gastric emptying study," and is scheduled for follow up testing at UW Hospital.  (Dkt. #69-1 at 145.)

As for Brown's dermatitis, the record does *not* include any renewed requests for

cotton blankets after November 2019.  Brown was referred to UW Dermatology on April 5, 2020, for his hypomelanosis, but blankets were never discussed.  (Dkt. #33-2 at 69.) In July 2020, Brown also restarted UVB light therapy and had several, follow-up visits into 2021.  (Dkt. #33-2 at 72, 74-77, 91.)  Further, Brown was seen by the UW Dermatology Department in June 2021, who recommended that he continue with UVB light therapy and found it reasonable for him to continue using hydroquinone cream after a short pause. (Dkt. #69-1 at 136, 163.)  Brown has since had additional, follow-up appointments with his Sand Ridge provider to monitor his progress.  (Dkt. #69-1 at 136, 140, 143.)

Finally, Dr. Kattenbraker attests that Brown's medical condition has remained "stable" while he has been at Sand Ridge, and he remains overweight.[5]  (Dkt. #69 at 7.) In Kattenbraker's view, Brown also could obtain *all* of his requested items, "but simply did not want to pay for them."[6]  For example, Kattenbraker attests that Brown already has a wedge pillow, may use cotton blankets, and is allowed to eat in his room (except when demoted to level B, as addressed below).  He also attests that Brown could eat as little or as frequently as desired simply by keeping fruit from his meal trays and ordering food from canteen services, including peppermints, or designated restaurants that he can store in his

---

[5] In his sur-reply, Brown purports to dispute the assertion that his medical condition has been stable, while at the same time acknowledging receipt of follow-up and ongoing care for the medical conditions underlying this lawsuit.  At the videoconference, Brown attested more specifically that instances of "food coming up" and other medical issues associated with an inability to digest adequately had gotten worse after his move from CCI.  However, that assertion is not enough to create a genuine dispute regarding the sufficiency of Dr. Kattenbraker's medical assessment of Brown's overall health.

[6] Although Brown does not claim that he qualifies, Sand Ridge Policy #SR648 provides for loans to indigent patients to purchase certain items to be repaid in installments as funds become available. (Dkt. #1-5 at 11-12.)

unit's refrigerator.  (*Id.* at 7-8.)  Brown has purchased snack food and beverage items from the canteen, including mints.  (Dkt. #33-3 at 1-16.)

Brown disputes that he should not have to purchase items recommended to help relieve medical symptoms.  Brown also disputes that he can use the unit's refrigerator, as he has not yet reached the required patient level for that privilege and asserts that he cannot always eat the type of fruit the state provides at mealtime.

### D.   Disciplinary Action

Brown further claims that defendants punished him because his medical condition limits how much he can eat, beginning with a warning on August 25, 2019, because Brown had fruit juice in his room past mealtime.  Patients at Sand Ridge have 30 minutes to eat each meal, and those who are classified at level C may eat in their room, the dayroom, or courtyard.  Upon completion of a meal, however, uneaten food must be returned to the kitchen, except for two pieces of fruit that must be eaten by curfew.  To provide a secure, therapeutic environment for patients, Sand Ridge also places limits on what personal property is allowed.  In particular, Sand Ridge Policy #SR115 establishes the policy and provides a list of allowable personal property items, excluding "food items in excess of the allowable in-room limits found during a room search."  (Dkt. #72-3 at 5.)

Director Bellile further attests that:  (1) food items become contraband after mealtime ends; and (2) contraband items are considered counter-therapeutic for the patients, as well as threaten the safety of the facility, because such items can be sold for cash or trade, used to hide or disguise other forms of contraband, and can lead to strong-arming and bartering.  (Dkt. #70 at 6-7.)  Regardless, Psychiatric Supervisor Park attests

9

that security staff and unit managers do not have the authority to modify rules at their own discretion; rather, if a patient alleges a medical condition as a defense to not following institutional policies or rules, a medical determination is made by a member of Sand Ridge medical staff; and if an accommodation is approved, a "special needs" slip is generated. (Dkt. #72 at 4.)  There is also no record of Brown ever being granted a right to keep food longer by Sand Ridge medical staff, other than retaining fruit for later.

While doing rounds at approximately 9:00 a.m. on October 12, 2019, Psychiatric Care Technician Schmelzle noticed that Brown had 3 fruits, corn flakes, milk, and juice in his room from breakfast served two hours earlier.  After telling Brown that he had 30 minutes to eat his breakfast like everyone else and directing him to dispose of the food, Schmelzle recalls Brown replying that, "I forgot to eat my breakfast.  I'm going to eat my breakfast!  I'm not scared of no [behavior disposition records]!  I can write as well as you can!"  (Dkt. #72-1 at 1.)   While Brown disputes saying this (dkt. #81 at 5), he acknowledges explaining that he could not eat as quickly as everyone else.   At his disciplinary hearing, Brown also admitted responding to Schmelzle after he repeated the directive to dispose of the food as follows:  "Ain't no way I'm throwing that stuff out!  Fuck that!  Fuck you, put that in there!"  (Dkt. #72-1 at 1.)  Ultimately, Schmelzle offered Brown a "summary sanction," which is meant to encourage patients to take ownership and responsibility for the consequences of their behavior and would have allowed him to admit to the charges without the need for a formal hearing.  Instead, Brown replied, "I ain't accepting nothing!"  (*Id.*) At that point, Schmelzle told Brown that a behavior disposition record ("BDR") would be forthcoming, and Psychiatric Care Supervisor Park would be

notified.  After being notified, Park then signed the BDR, although he asserts that such BDRs do not impact the length of a patient's stay at Sand Ridge.  (Dkt. ##72 at 4, 72-1 at 1.)  Still, Schmelzle did not just charge Brown with possession of contraband, but also with failure to take direction, disrespecting staff, and showing disruptive behavior.

On October 15, 2019, a BDR Hearing Committee comprised of Psychiatric Care Supervisor Donovan, Unit Supervisor Pouillie, and a nondefendant heard from Brown. Specifically, the allegations were read to Brown, who was then given the opportunity to respond.  Although he refused to explain his medical history in detail, Brown asserted that he could no longer eat normally since his surgery, while stating that he generally did not talk to health services doctors or nurses.  (Dkt. #72-1 at 2.)  However, Brown did show the Committee members his health forms from CCI that he maintained explained his condition.  (*Id.*)  At the hearing, Brown also admitted to having the food in his room past mealtime and refusing to throw it out, including saying to Psychiatric Care Technician Schmelzle, "Fuck that!  Fuck you, put that in there!"  (*Id.*)  Based on those admissions, the Committee upheld the BDR and demoted Brown from level C to level B for a one-month period, from October 15 through November 13, 2019.  At level B, Brown was subjected to a greater degree of supervision.

Brown did not receive a copy of the BDR itself until *after* the disciplinary process had ended on October 15, 2019.  Sand Ridge Director Bellile asserts that in this respect, Sand Ridge's disciplinary process differs from the disciplinary process Brown would have encountered as an inmate in DOC custody, and that former inmates often assume mistakenly that the rules remain the same when they become civilly detained.  Brown also

attests that Schmelzle omitted from his BDR any reference to Brown explaining his medical condition to Schmelzle.  (Dkt. #81 at 5.)

Brown appealed the BDR Hearing Committee's ruling and award of sanctions, arguing that:  (1) he was being punished for having a medical condition limiting how much and how quickly he could eat at any one time; and (2) the Committee did not provide him with notice of the charges or a witness form before his hearing, and did not consider his medical evidence.  (Dkt. #72-1 at 3.)  Sand Ridge Director Bellile affirmed the BDR Hearing Committee's decision and disposition because policy was followed *and* because the rule violation was substantiated, although Bellile now attests that he was unaware of Brown's medical condition until after his affirmance, which Brown disputes.  Moreover, Bellile found no record of Brown being granted a relevant medical accommodation by Sand Ridge medical staff.  (Dkt. #70 at 5.)  Finally, Brown unsuccessfully challenged the disciplinary decision through the client rights grievance resolution process.  (Dkt. #82-6 at 3-6.)

OPINION

Defendants seek summary judgment on the merits of all of plaintiff's claims.[7] Plaintiff is not a prisoner, so his claims arise under the Fourteenth Amendment and are subject to an objective reasonableness inquiry.[8]  *Williams v. Ortiz*, 937 F.3d 936, 942 (7th

---

[7] Because defendants are entitled to summary judgment on the merits, the court will not reach their alternative argument that they are entitled to qualified immunity.

[8] Although sometimes mistakenly referred in prior orders as claims for "deliberate indifference" (*e.g.*, dkt. #21), the court has consistently recognized that plaintiff's claims arise under the Fourteenth Amendment, not the Eighth.  (Dkt. #21 at 12-13 (granting plaintiff leave to proceed).)

Cir. 2019).   To survive summary judgment in the face of a substantial showing by defendants, therefore, plaintiff must demonstrate that genuine issues of material fact exist on two questions:  (1) whether he suffered from an objectively serious medical need; and (2) whether defendants' response to that need was objectively reasonable.  *Id.*  In assessing the reasonableness of a defendant's response, the court considers the totality of the facts and circumstances*.  Id.*  Proof of negligence will not meet this standard; rather, plaintiff must show the defendants acted "with purposeful, knowing, or reckless disregard of the consequences" of their actions.  *Miranda v. Cnty. of Lake*, 900 F.3d 335, 354 (7th Cir. 2018).

Here, defendants do not dispute for purposes of summary judgment that plaintiff's chronic gastroesophageal and dermatologic issues are serious medical conditions, so the sole, operative question on the merits of plaintiff's claims is whether defendants' responses to those conditions were objectively reasonable.  Before turning to plaintiff's remaining claims against the other defendants involved in his disciplinary proceeding, the court will first address plaintiff's claims against Sand Ridge's Director of Nursing Thomas and Physician Manager Kattenbraker, as the only members of the Special Needs Committee.

## I.  Defendants Thomas and Kattenbraker

Plaintiff challenges the Special Needs Committee's decision to deny him certain accommodations such as smaller, more frequent meals, and to decline to provide *at no cost* cotton blankets, peppermints, a third pillow, or a nighttime snack, most of which he had reportedly received free as a medical accommodation while an inmate at CCI.  As an initial matter, the record does not begin to support an inference of objective unreasonableness in

13

requiring plaintiff to provide his own cotton blankets or peppermints since he neither offered evidence that itching *remained* a known, ongoing concern for him at Sand Ridge, nor that the blankets had been prescribed to relieve any symptoms of hypomelanosis. Moreover, plaintiff gives no specific response to defendants' assertion that cotton blankets *or* peppermints were not medically necessary for either of his serious medical needs. Thus, he has failed to establish any genuine dispute of material fact on which a reasonable jury could find in his favor as to either item.

Nurse Thomas and Dr. Kattenbraker also repeatedly declined to provide plaintiff with a third pillow. Plaintiff does not dispute that he has a wedge pillow that raises the head of his bed. Rather, he maintains that he needs a second, regular pillow to raise the head of his bed by the full 6 to 8 inches originally recommended by a physician in 2017, without explaining how that would make a material, medical difference. Even if the jury accepted plaintiff's estimate, the more recent 2019 recommendation by the UW nurse practitioner was merely to "elevate" the head of the bed (dkt. #33-2 at 102), which the combination of the wedge and pillow would appear to do. Thus, while the Special Needs Committee explanation that Sand Ridge "does not provide extra pillows beyond the allowable limit of two" might appear a bit rigid (dkt. ##56-2 at 1, 82-2 at 2), allowing plaintiff a wedge and pillow leaves no room for a reasonable jury to find the defendant medical providers' explanation for not allowing a third pillow to be *objectively unreasonable*.

Plaintiff makes a stronger showing in support of his request for a snack or more, small state-provided meals and additional time to consume them. These defendants denied plaintiff's requests from August 2019 through February 2020, inflexibly insisting on his

consumption of 3 standard meals, each at a single, 30-minute sitting.  Thomas and Kattenbraker have not offered plaintiff much explanation for doing so in their denials, beyond references to general institutional policy.  (*See* dkt. #56-2 at 1, 12.)  Plaintiff avers that the 30 minutes allotted for consumption of a standard meal is not enough for him to digest comfortably, an assertion that at least one UW specialist credits.  Moreover, a reasonable jury could find on this record that staff enforces meal consumption times strictly absent medical accommodation, apparently out of contraband concerns.  Plaintiff further argues that the Committee's position appears to contradict Wisconsin Department of Health Services' regulations for treatment facilities, including Sand Ridge, which direct, among other things, that "[e]ach inpatient shall be provided a nutritional diet," and that "snacks between meals shall be accessible to inpatients on all living units, except when contraindicated for individual patients."  Wis. Admin. Code § DHS 94.24(4)(a), (b).

Defense counsel represented at the videoconference that snacks are accessible, and defendants maintain that no special, medical accommodations are required for plaintiff to be able to eat several, small meals throughout the day.  That is because the canteen is available to patients and patients can keep state-provided fruit beyond mealtimes.  Defendants further assert without dispute that the Sand Ridge kitchen closes at night and cannot provide a nighttime snack, and otherwise providing food outside of regular meal service hours would require additional, administrative oversight.  Although plaintiff may not have access to his unit refrigerator, he does purchase snack food and drinks from the canteen and does not dispute that he can also save the fruit from his meal trays to eat throughout the day, leaving him with less food to consume during the regular mealtime as

well as food to keep for in between his meals.  While plaintiff asserts that he cannot always eat all of the state-provided fruit, he does not substantiate how often this is the case, nor does he substantiate his claim that the canteen offerings are not healthy or specify any staff concerns documented in the record about his meal consumption time.

Plaintiff asserts that his symptoms have worsened at CCI, but objective measures of plaintiff's overall medical health have remained stable as Kattenbraker attests and plaintiff's HSRs do not reveal a consistent history of complaints about digestive issues. Since his fundoplication surgery, plaintiff has had a normal esophageal pH study in July of 2019; a normal swallow study and esophagram in April of 2021; and he has enjoyed medical stability generally and received ongoing, follow-up care without exhibiting a decline in health or documented, concerning symptoms, such as weight loss or malnutrition.

In fairness, plaintiff has an argument that defendants Thomas and Kattenbraker failed to adequately explain their rejection of plaintiff's requests for additional snacks or smaller meals, or a longer mealtime, in their responses to his accommodation requests. However, in explaining their decision, these defendants did point to other accommodations already made for the plaintiff -- like keeping fruit and at least the possibility of supplementing his diet from other sources -- and now note the practical constraints at Sand Ridge of making an exception for plaintiff.  More importantly, defendants point out that the accommodations they declined were only recommendations made in light of ongoing follow-up care that did not reveal any concerning physical changes.  When combined with the lack of any contrary medical evidence that plaintiff's conditions worsened after the

16

change in treatment at Sand Ridge, the record does not support a finding that the defendants' exercise of medical judgment even amounted to negligence, at least absent evidence of a medical necessity *or* definitive prescription for a different approach by a medical specialist.  Although plaintiff disagrees with Kattenbraker and Thomas's decisions, "a plaintiff's disagreement with the provider's course of treatment [does not] mean that the course of treatment was objectively unreasonable." *Montanez v. Mahaga*, No. 18-cv-692-pp, 2020 WL 2085288, at *3 (E.D. Wis. April 30, 2020) (citing *Williams v. Ortiz*, 937 F.3d 936, 944 (7th Cir. 2019)).  Accordingly, Kattenbraker and Thomas are entitled to summary judgment on plaintiff's claims.

## II. Defendants Bellile, Park, Donovan, Pouillie, and Schmelzle

Plaintiff also challenges the October 2019 disciplinary proceeding, but defendants Bellile, Park, Donovan, Pouille, and Schmelzle are entitled to summary judgment. Although not prisoners, Chapter 980 patients may still be disciplined for violating the rules of the institution in which they are confined.  *See Allison v. Snyder*, 332 F.3d 1076, 1079 (7th Cir. 2003) (Chapter 980 patients "may be subjected to conditions that advance goals such as preventing escape and assuring the safety of others"); *West v. Schwebke*, 333 F.3d 745, 748 (7th Cir. 2003) (a pretrial detainee "may be punished for violating institutional rules").  Here, plaintiff admitted at the hearing that he had food in his room past mealtime and made disruptive statements disrespectful to Psychiatric Care Technician Schmelzle, who contrary to his title was responsible for maintaining order in the civil psychiatric unit, not providing medical treatment.

Even so, plaintiff maintains that defendants Bellile, Park, Donovan, Pouillie, and

Schmelzle, none of whom are medical personnel, all punished him unreasonably because they did not consider that his medical condition limited how much he can eat. However, these defendants are entitled to summary judgment in their favor as well. First, there is no dispute that plaintiff had food in his room two hours after breakfast that he had not yet tried to eat and at that point raised contraband concerns. Second, there is no dispute that non-medical security staff and unit managers cannot modify rules; rather, they are obligated to enforce those rules, including removing food contraband from patients. Third, there is no dispute that if a patient raises a medical condition as a reason for not complying with institutional policies or rules at Sand Ridge, *medical staff* make the determination regarding any accommodation, *and* medical staff had *not* granted plaintiff a special needs slip in October of 2019 that allowed him to keep his meal trays past mealtime. Fourth, plaintiff had already been warned in August of 2019 not to violate the policy again.

Accordingly, the record does not support a finding that Schmelzle's and Park's actions were objectively unreasonable in issuing plaintiff a formal BDR on October 19, 2019, even assuming plaintiff told Schmelzle that he must generally eat more slowly, especially after he made at least one, disruptive and disrespectful statement and refused to work towards a less formal resolution.[9] In particular, plaintiff offers no evidence suggesting that non-medical staff were trained to evaluate his medical needs, nor explain why they should have excused his rule violations, even if they had the discretion to do so, especially based on a medical condition requiring slow eating when he had not yet apparently even

---

[9] The latter does not mean that plaintiff's failure to accept Schmelzle's offer of a summary sanction instead of a formal BDR constituted a separate violation, but rather that an explicative-laden response and refusal to dialogue made the issuance of a formal BDR reasonable, if not compelled.

tried his food.  Finally, like all these non-medical defendants, Schmelzle and his supervisor Park were entitled to rely on Sand Ridge medical staff to issue any medical accommodations appropriate for plaintiff, if any, before easing policy.  *See King v. Kramer*, 680 F.3d 1013, 1018 (7th Cir. 2012) (institution staff who are not responsible for administering medical care are entitled to defer to the judgment of health care professionals); *Miranda*, 900 F.3d at 343 (in detainee context, non-medical staff "may generally trust the professionals to provide appropriate medical attention"); *Stojanovic v. Bellile*, No. 19-cv-729-bbc, 2020 WL 7477765, at *5 (W.D. Wis. Dec. 18, 2020) (granting summary judgment to a Sand Ridge psychiatric technician who "acted reasonably in deferring to the judgment of health services staff").

In light of these facts and circumstances, defendants Belille, Donovan and Pouillie, as panel members of the BDR Hearing Committee, could not reasonably be found to have responded either with reckless disregard or in an objectively unreasonable manner.  Again, plaintiff admits to multiple rule violations, which Donovan and Pouillie discussed with him at the hearing.  While they did not allow plaintiff to present any witnesses, that, too, was in keeping with institutional policy.  Further, plaintiff does not specify even now *who* he would have called as witnesses nor what testimony they would have provided.  Finally, plaintiff *was* allowed to present documentation of his medical condition.

While plaintiff argues that the hearing committee must have ignored his condition because they still imposed a level demotion, plaintiff also acknowledged to the panel members that he did not speak to HSU doctors or nurses, *and* he would not explain his medical history to the panel, beyond indicating generally that he could not "eat like

everyone else." (Dkt. #72-1 at 1.)  Similarly, plaintiff noted in his appeal to Sand Ridge Director Belille that his condition generally "dictates how much [he] can eat" and he "cannot eat like everyone else," while providing little insight into his condition.  Nor did he explain to Belille how his demotion would affect him, why his breakfast remained uneaten after two hours that day, or why his undisputed, offensive statements to Schmelzle should be excused.  (Dkt. #72-1 at 3.)  At bottom, as with defendants Schmelzle and Park, plaintiff offered *no* evidence suggesting that the remaining defendants had any medical training to evaluate what they were being told, much less knew plaintiff was being inadequately treated.  *Kramer*, 680 F.3d at 1018; *Miranda*, 900 F.3d at 343; *cf. Burks v. Raemisch*, 555 F.3d 592, 595 (7th Cir. 2009) (noting that "[b]ureaucracies divide tasks." and "people who stay within their roles" cannot be liable under § 1983 "for not being ombudsmen").  Accordingly, all of these defendants are entitled to summary judgment in their favor.

Finally, plaintiff suggests that there are procedural flaws in Sand Ridge's disciplinary process.  Specifically, he notes the failure to provide him with a copy of his BDR before the hearing, allow him to present witnesses, and to provide a written statement (other than from the BDR) upon what evidence their decision was based.  Plaintiff argues that all of these things violate the requirements of *Wolff v. McDonnell*, 418 U.S. 539 (1974).  In *Wolff*, the United States Supreme Court held that due process in a prison disciplinary proceeding requires:  (1) advanced written notice of the disciplinary charge; (2) the opportunity to call witnesses and present documentary evidence when not "unduly hazardous to institutional safety or correctional goals"; and (3) a written statement by the factfinders of their decision

that includes the evidence relied upon and the basis for their decision.  *Id.* at 563-66.

Even ignoring that plaintiff was *not* granted leave to proceed on a procedural due process claim, nor sought reconsideration of the court's leave to proceed order, patients civilly committed under Wis. Ch. Chapter 980, like prisoners, are not entitled to due process protections, *unless* (1) their duration of confinement is increased or (2) they are subjected to an "atypical and significant" hardship.  *Thielman v. Leean*, 282 F.3d 478, 483-84 (7th Cir. 2002); *see also Sandin v. Conner*, 515 U.S. 472, 484 (1995) (describing "atypical and significant" hardship standard for prisoners).  Here, plaintiff's duration of confinement was not increased based on his conduct; he was merely demoted to "level B" for about a month.  Plaintiff neither argues at summary judgment that this demotion constituted a significant hardship, nor offers any medical evidence that would suggest his health was declining because of the demotion.

In any event, this court has previously held that the usual consequences of a BDR hearing for Chapter 980 patients does not constitute "atypical and significant" hardship. *E.g.*, *Martin v. Bartow*, No. 09-cv-584-bbc, 2009 WL 4042896, at *1 (W.D. Wis. Nov. 19, 2009) (Chapter 980 patient's loss of various activities and privileges did not create liberty interest under *Sandin*); *Hogan v. State of Wisconsin*, No. 06-c-467-c, 2006 WL 2849870, *2 (W.D. Wis. 2006) (Chapter 980 patient did not retain liberty interest in level of classification, including placement in short-term segregated confinement); *Thielman*, 282 F.3d at 483-84 ("*Sandin* teaches that any person already confined may not nickel and dime his way into a federal claim by citing small, incremental deprivations of physical freedom.").  Accordingly, all defendants are entitled to summary judgement on all of

plaintiff's claims, and this case must be dismissed in its entirety.

## III.  Transcript Request

Finally, plaintiff has filed a request for a transcript of the June 17, 2022, videoconference, as well as copies of "any notes or documents concerning the expert testimony given to the court" and mentioned at that proceeding.  (Dkt. #92.)  As an initial matter, the court is uncertain to what "expert testimony" plaintiff refers.  Nor will the court provide plaintiff any of its own notes concerning the proceeding.  At most, the court can direct plaintiff to the record in this case, including medical records, other exhibits, and declarations.

As for a transcript, plaintiff does not explain why he is making this request, nor cite any authority in support.  Parties who request a transcript generally must pay a fee to the court reporter.  28 U.S.C. § 753(f).  There is a narrow exception that applies only when a party who is proceeding *in forma pauperis* under 28 U.S.C. § 1915 needs transcripts for an appeal that the judge "certifies . . .is not frivolous (but presents a substantial question)." *Id.*  In the context of determining when transcripts should be provided for indigent litigants, the Supreme Court further directs that "the expenditure of public funds is proper only when authorized by Congress."  *United States v. MacCollom*, 426 U.S. 317, 321 (1976). Since neither § 1915 nor § 753 reflect a congressional directive that a transcript be provided to litigants for proceedings in the district court, much less a relatively meaningless exchange leading up to this opinion, the court will deny plaintiff's request for a transcript.

ORDER

IT IS ORDERED that:

1)  Defendants' motion for summary judgment (dkt. #66) is GRANTED.

2)  Plaintiff's transcript request (Dkt. #92) is DENIED.

3)  The clerk of court is directed to enter judgment in defendants' favor and to close this case.

Entered this 12th day of September, 2022.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge